IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDER MILL SERVICES, LLC, a Pennsylvania limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BEARING DISTRIBUTORS, INC., an Ohio corporation, and **M-I, LLC**, a Delaware Limited Liability Company,<br><br>Defendants. | 2:06cv1116<br>**Electronic Filing** |

## OPINION

Alexander Mill Services, LLC ("AMS" or "plaintiff") commenced this action seeking redress for injuries allegedly sustained from entering into a commercial transaction with defendant Bearing Distributors, Inc. ("BDI"), to de-liquify industrial sludge at a job site in Ohio. Presently before the court are defendants' partial motion to dismiss and motion to dismiss. For the reasons set forth below, the motions will be granted in part and denied in part.

In the fall of 2004, plaintiff entered into a contract with BDI for the processing of industrial sludge at an industrial site in Cebring, Ohio. Relying on the expert advice of BDI, plaintiff agreed to purchase a centrifuge system for de-liquefying the industrial sludge based on an understanding that the system would be able to address AMS's specific situation, with minimal down time, at the stated contract price, and the process would be the most efficient, least expensive and most expeditious approach for handling AMS's needs. This understanding was based on BDI's indication that it offered a complete solution for de-liquefying industrial waste, its proposed solutions were individualized and would be accomplished with minimal downtime, and it possessed broad experience, had the appropriate technical experts and engineers on staff and was a world leader in the industry. Complaint at ¶ 6.

After BDI did all of its own sampling, testing and evaluation of the materials to be processed, BDI proposed and plaintiff purchased an Alpha Laval centerfuge for $143,300.00 as

part of what plaintiff has identified as "complete package solution #1." Complaint at ¶¶ 7-8.

After the Alpha Laval centerfuge was installed at the site on or about July 25, 2005, plaintiff indicated to BDI that it was not satisfied with the package in that (a) modifications and retro fittings were necessary to the centerfuge to stop it from breaking down after only a short period of time; (b) the centerfuge was only able to process the sludge at one third of the rate specified by AMS in the contract; (c) adjustments to the equipment did not improve its performance; (d) AMS did not believe the package was individualized to its particular needs; (e) AMS was being called upon to pay for additional expensive chemical additives in order to complete the processing; and (f) AMS had incurred costly downtime. Complaint at ¶ 8. After AMS's dissatisfaction with complete package solution #1 became known, BDI proposed another solution for an additional cost of $100,000.00. Feeling financially strapped from the arrangements and payment of $143,000.00 to BDI for complete package solution #1, AMS agreed to go forward with complete package solution #2, believing it was only in a position to negotiate financing terms.

Consistent with BDI's proposal, BDI arranged with defendant M-I/SWECO to install a new centerfuge supplied by M-I/SWECO. Complaint at ¶¶ 9-11. Plaintiff gave BDI and M-I/SWECO complete access to the material and job site in preparing for and installing the new centerfuge. Complaint at ¶¶ 10. Complete package solution #2 failed to meet plaintiff's expectations for essentially the same reasons: (a) it could not process the sludge at the specified rate of 12 to 14 tons per hour; (b) adjustments to the equipment did not materially improve its performance; (c) complete package solution #2 did not meet AMS's individualized needs; (d) AMS was required to purchase additional expensive chemical additives in order to carry out the process; and (e) AMS had incurred costly downtime. Complaint at ¶ 11.

After AMS expressed its dissatisfaction with complete package solution #2, BDI and M-I/SWECO proposed complete package solution #3, which involved a different M-I/SWECO centerfuge. Complete package solution #3 cost an additional $127,300.00, bringing the total

price to $371,000.00. AMS agreed to complete package solution #3 under essentially the same circumstances that existed when it agreed to complete package solution #2. It gave BDI and M-I/SWECO complete access to the job site and material in order to perform whatever testing or sampling they desired. Complaint at ¶¶ 12-13. Complete package solution #3 failed to meet AMS's contract expectations for the same reasons AMS found complete package solutions #1 and #2 to be unsatisfactory. Complaint at ¶ 14.

Based on advertising and information made available on defendants' sites on the world wide web, "BDI and [M-I/SWECO] held themselves out as being experienced, world-class, experts in the field of foundry sludge de-watering...." Complaint at ¶ 15. Through this information and advertising defendants each indicated they (1) offered complete solutions for de-liquefying industrial waste through the use of various equipment, (2) could provide individualized solutions for any specific job that would minimize down time, (3) had broad expertise and technical experts and engineers on staff, and (4) were world leaders in the industry for getting the job done right. Complaint at ¶ 6; Plaintiff's Brief in Opposition (Doc. No. 25) at 7 (Defendants represent on their respective websites and promotional materials and brochures that they create complete package solutions, are experts in the field of de-watering materials, and tailor individualized solutions for each customer.).[1]

Plaintiff became financially responsible for the costs of removing each centerfuge after it failed to perform as BDI had promised. Complaint at ¶¶ 8(g), 11(f) and 14(f). Plaintiff also experienced downtime, which in turn caused it to lose revenue and profits and incur overtime labor costs in an effort to mitigate damages. Complaint at ¶ 16. The down time also caused its reputation to be tarnished with its customers and potential customers. Complaint at ¶¶ 16-18. Consequently, its damages include, the purchase price of each complete-package solution; downtime; overtime; lost revenues and profits; costs of chemical additives; reputational damage;

---

[1] The court has assumed for the instant purposes that plaintiff's references to defendant's websites, promotional materials and brochures have been incorporated into the complaint.

3

and equipment removal costs.

Defendants failed to advise plaintiff at any time that any of the proposed packages would not or might not be able to de-water the industrial sludge in question at the required rate of 12 to 14 tons per hour; plaintiff only learned of the inadequacy when each proposed solution failed. Complaint at ¶ 20. After each failure, defendants "could not or would not figure out how to meet AMS's specifications, but instead falsely promised AMS each time that they had absolutely figured it out and had the complete solution to meet AMS's specification of 12-14 tons of material processed per hour." Complaint at ¶ 21. Defendants knew that the personnel assigned to the project lacked sufficient expertise and experience to be able to say with certainty that they could devise a complete-package solution to process the sludge at the specified rate per hour. Complaint at 22. Nevertheless, they believed their personnel could adapt to and extrapolate techniques from other projects to meet the specifications of the AMS project. By entertaining this belief, defendants understood that the process would inevitably become one of trial and error, but they hid this fact from AMS because they knew AMS would select a competing belt press technology offered by other companies if it became clear that the proposed solution would not meet plaintiff's needs. Complaint at ¶¶ 23-24. Defendants also knew that centerfuges in the price range that AMS could afford would not meet its specifications and it would have to upgrade to more expensive models. They likewise hid this fact from AMS because they knew it would not agree to the proposed contractual arrangements and instead would select the competing belt press technology. Complaint at ¶¶ 26-27.

"AMS planned to compete with BDI and [M-I/SWECO], by taking the complete-package solution, learning from it, improving it where possible, and entering the market in competition with [M-I/SWECO] and BDI in the niche of de-liquefying material from foundries and steel mills." Complaint at ¶ 34. AMS' sister companies had used similar approaches to expand their businesses for years. Complaint at ¶ 35. Plaintiff believed that it would only take a short time for it to enter the market and compete successfully. It planned to accomplish this by utilizing "as

little outside financing as possible, reinvesting profits, purchasing used equipment inexpensively, and repairing and modifying it in-house for resale." Complaint at ¶ 37. Its plans to compete were delayed, however, by the failure of defendants to produce a complete-package solution that worked. Complaint at ¶ 38.

"Regardless of the outcome of this lawsuit, AMS intends to enter the niche market and compete against BDI and [M-I/SWECO] for the business of foundry and steel mill materials de-liquification as soon as possible." Complaint at ¶ 39. Inevitably, if BDI and M-I/SWECO's advertising is not enjoined, AMS will be forced to pay for expensive counter-advertising and will lose some actual or potential customers to their advertising. Complaint at ¶ 40. "AMS's share of that niche market can be professionally estimated given customer and industry purchasing history, including weighting for each variable in the purchasing process, such as, for example, price differences, experience differences, and reputation differences." Complaint at ¶ 41.

Based on the above allegations, AMS advances claims under the following causes of action: Count One - Fraud and Intentional Misrepresentation; Count Two - Negligent Misrepresentation; Count Three - False Advertising in violation of the Lanham Act; Count Four - deceptive trade practices under Pennsylvania and Ohio law; Count Five - Breach of Contract and the implied warranty of fitness for a particular purpose; Count Six - Promissory Estoppel; Count Seven - Breach of Implied Warranty of Merchantability; Count Eight - Tortous Interference with Exiting Business Relationships; and Count Nine - Civil Conspiracy. Complaint at ¶¶ 43-85. BDI moves to dismiss the tort claims against it on the ground that they merely are re-cast contract claims and are barred by the "gist of the action" doctrine. It seeks to dismiss the false advertising claim under the Lanham Act on the ground that plaintiff lacks standing to pursue such a claim. Finally, it contends that the civil conspiracy count properly is dismissed because any tort claim in the complaint fatally is defective and, in light of the contractual relationship between AMS and BDI from the beginning, it could have not been conspired with M-I/SWECO to induce AMS to become BDI's customer.

M-I/SWECO likewise contends that plaintiff's fraud and misrepresentation claims are barred by the "gist of the action" doctrine, plaintiff lacks standing to pursue a claim for false advertising under the Lanham Act and the civil conspiracy count cannot stand without a viable claim for fraud. It further contends that plaintiff has not stated a claim for deceptive trade practices because it does not qualify as a purchaser under Pennsylvania's Unfair Trade Practices and Consumer Protection Act and plaintiff has failed to allege any deceptive trade practice that occurred in the state of Ohio. Finally, M-I/SWECO observes that it is not alleged to have entered into a contract with AMS and as a result all of the contract-based claims against it are flawed as a matter of law.

AMS concedes that it has failed to state a claim for tortous interference with existing business relationships. Plaintiff's Brief in Opposition (Doc. No. 25) at 13. It contests defendants' motions in all other aspects. Specifically, it contends that because it was "poised" to compete with defendants within the identified niche market, it has standing to pursue a false advertising claim under the Lanham Act. Furthermore, it contends that its fraud and misrepresentation claims are distinct from its contracts claims because:

> [AMS] is not claiming in the tort claims that the wrong doing is the failure to process 12-14 tons per hour but, instead, that defendants knew they did not know how, but lied and said they did, and sold AMS more and more expensive equipment based on that lie, and knew that, as a start up operation, AMS could not afford such down time, and did not care.

Id. at 12. Furthermore, defendants repeated and extended these lies "to hold AMS financially hostage while increasing the price of the economic ransom by hundreds of thousands of dollars at each step." Plaintiff's Sur-reply Brief (Doc. No. 35) at 5. And at each step defendants made additional misrepresentations about their ability to remediate the equipment problems while AMS continued to incur additional losses. Id.

It is well settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

6

them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)). The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). Under this standard a complaint will be deemed sufficient if it adequately puts the defendant on notice of the essential elements of a cause of action. Nami, 82 F.3d at 66.

While all factual allegations and reasonable inferences to be drawn therefrom are to be accepted as true, "a court need not credit a complaint's 'bald assertions' or 'legal conclusion' when deciding a motion to dismiss." Morse v. Lower Merior School District, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted). In ruling on a 12 (b)(6) motion courts consistently have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law" or "sweeping legal conclusions cast in the form of factual allegations." Id. at n.8 (citing in support Charles Allen Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1997), Leeds v. Meltz, 85 F.2d 51, 53 (2d Cir. 1996) ("while the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice") and Fernandez-Montes v. Allied Pilots Ass'n., 987 F.2d 278, 284 (5th Cir. 1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.")).

Plaintiff lacks prudential standing to pursue a false advertising claim under the Lanham Act. In addition, it's fraud and misrepresentation claims are barred by the gist of the action doctrine. The civil conspiracy count fails because plaintiff has failed to present a viable cause of action in tort. Similarly, plaintiff was not a purchaser protected by a private cause of action

under the deceptive trade practices statutes in question. The balance of the motions will be denied without prejudice to raise the same arguments in support of summary judgment.

Plaintiff misapprehends the purpose of the private remedy available under section 43(a) of the Lanham Act and the type of the injury and interests that give a party prudential standing to bring a false advertising claim under that section.

"Section 43(a) is intended to provide 'a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising.'" Joint Stock Society v. UDV North America, Inc., 266 F.3d 164, 180 (3d Cir. 2002) (quoting Serbin v. Zebart Int'l Corp., 11 F.3d 1163, 1175 (3d Cir. 1993)). And while a non-competitor can on occasion have standing to sue under section 43(a), "the focus is on protecting 'consumer interests that have been harmed by a competitor's false advertising' ... and 'securing to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'" Id. at 180 (quoting Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F.3d 316, 321 (3d Cir. 1995) and Conte Bros. Auto., Inc., v. Quaker State-Slick 50, Inc., 165 F.3d 221, 234 (3d Cir. 1998) (quoting legislative history.)).

Prudential standing requirements reflect an integral part of judicial self-governance. Id. at 179. They serve "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Id. (quoting Conte Brothers, 165 F.3d at 225. Under section 43(a), the following factors are pertinent in considering whether a party has prudential standing:

1) The nature of the plaintiff's alleged injury; is the injury of the type that Congress sought to redress in providing a private remedy for violations of the Lanham Act?

2) The directness or indirectness of the asserted injury.

3) The proximity or the remoteness of the party to the alleged injurious conduct.

8

   4)  The speculativeness of the damages claim.

   5)  The risk of duplicative damages or the complexity in apportioning damages.

Id. at 179-80. These factors are to be applied on a case-by-case basis, and are to be weighed without any one factor being given determinative weight. Id. at 180.

  Consideration of the above factors conclusively demonstrates that plaintiff lacks prudential standing under section 43(a).

  The first factor seeks to assure that an injury is present that "flows from that which makes defendants' acts unlawful." Id. (citations omitted). In other words, the focus is on whether an injury is present that "was caused by a false designation of origin or false advertising." Id. at 180-181. An allegation that consumers have and will be deceived by the defendant's false advertising into purchasing products based on that advertising to the detriment of plaintiff's ability to sell comparable products or services to those consumers is an example of the type of injury Congress sought to redress by providing a private remedy under section 43(a). Id. at 181.

  Plaintiff has not identified an injury or form of harm for which Congress sought to provide redress by promulgating section 43(a). While plaintiff has made clear its manifest intent to enter the market and compete with defendants, its injury arises from its status as a consumer. And while plaintiff had every intent to usurp defendants' technology and expertise and pass it off as its own, it has not reached that level of market entry. It follows that any injury claimed by plaintiff cannot involve a diversion of business reputation and good will or a similar commercial interest involving the potential pool of consumers comprising the "niche" market plaintiff intends to enter. Thus, the first factor weighs against prudential standing.

  The second factor focuses on the directness of the asserted injury. This factor considers "whether the defendants' conduct has had a direct effect on either the plaintiff or the market in which [the parties] participate." Id. at 181. (citations omitted).

  While plaintiff has identified an injury from defendants' assertedly false advertising that might have an effect in the market in which plaintiff intends to participate, plaintiff has not

suffered an injury from the impact of such advertising in the market beyond its position as a single consumer. Plaintiff complains that defendants' false advertising leads consumers to purchase products and services based on defendants' proclaimed expertise and indication that their formulated solutions will be competitively priced and tailored to satisfy the consumer's individual needs. While such assertedly false advertising could well detract from the reputation or good will of those competitors in the market that actually have such expertise and can provide goods and services at such a level, plaintiff is not one of them. Plaintiff essentially has suffered injury as a commercial consumer. Thus, its injury is more indirect than the commercial interests of a market competitor. The lack of a direct injury diminishes the weight to be given to this factor in ascertaining whether plaintiff has prudential standing under the Lanham Act. Id. at 182.

The third factor concerns the proximity of the plaintiff to the allegedly harmful conduct. In considering this factor, the courts task "is to determine whether there is 'an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest' by bringing an enforcement action." Id. The existence of such a class diminishes the justification of permitting more remote parties to pursue causes of action as private attorney generals. Id.

Clearly, an identifiable class of persons that possess a self-interest in vindicating the public interest exists. This class consists of those who compete in the market of de-liquefying industrial sludge, whether through the centerfuge technology or the belt press technology. Each competitor within these two separate market subgroups is a member of an identifiable class that assumably has suffered a more direct injury under section 43(a) as a result of the false advertising asserted by plaintiff. And while a plaintiff that has taken some steps in preparation for possibly entering the market does have a commercial interest that potentially has been injured, and may have standing under appropriate circumstances, the Third Circuit's precedent acknowledges "that a direct competitor will usually have a stronger commercial interest than a non-competitor." Id. at 183 n. 10. Thus, this factor provides little justification for recognizing standing in plaintiff.

The fourth factor seeks to gage the speculativeness of the damages claimed. Plaintiff's

10

allegations in the complaint essentially demonstrate the speculativeness of its damage claim. Plaintiff avers that its "share of [the] niche market can be professionally estimated given customer and industry purchasing history, including weighing for each variable in the pricing process, such as, for example, price differences, experience differences, and reputation differences." Complaint at ¶ 41. Of course, plaintiff has no proven track record in the niche market and any such estimate will have to be based entirely on extrapolations from information pertaining to defendants' actual and potential foundry and steel mill customers, which plaintiff plans to obtain through discovery and expert analysis. It is difficult to imagine a damage claim that would be more speculative and conjectural.

    The final factor considers the risk of duplication of damages or the complexity in apportioning damages. This factor also weighs against recognizing standing based on the injury plaintiff advances. Clearly, every consumer of defendants' products and services that ultimately are unsatisfied with those products and services could advance a damage claim very similar to that being advanced by plaintiff. Similarly, any such consumer who was contemplating entering into competition in the market in which defendants operate likewise can advance a similar damage claim. Opposed to these potential plaintiffs, those with commercial interests who actually compete in the sub-markets in which the defendants' products and services are sold assumably have damage claims from defendants' false advertising. Given the speculative nature of the damages claimed by plaintiff and those consumers in a position to make similar claims, permitting them to sue would create a true danger of duplicating damages with those available to the direct competitors, a result that potentially "would subject defendant firms to multiple liabilities for the same conduct and would result in administratively complex damages proceedings." Id. at 185 (quoting Conte Bros., 165 F.3d at 235). Such a potential undermines the attractiveness of permitting remote parties like plaintiff to pursue a section 43(a) claim.

    All five factors to be considered in conducting a prudential standing analysis under section 43(a) weigh against recognizing prudential standing in plaintiff. Accordingly, plaintiff

11

lacks prudential standing to assert a section 43(a) claim against defendants and their motion to dismiss Count 3 will be granted.

Plaintiff's attempt to maintain fraud and misrepresentation claims based on the course of conduct alleged in the complaint also is misplaced. Plaintiff argues that the assurances from defendants to the effect that they knew unconditionally how to make the centerfuge technology perform to the specification of "12-14" tons per hour, when in fact they did not know how to do it and were guessing at best," coupled with plaintiff's lack of experience in the field and complete reliance on defendants to provide an individualized solution for its particular needs, and defendants' repeated attempts to "take AMS financially hostage and increase the size of the ransom" with each subsequently proposed complete package solution, are sufficient to overcome the defendants' invocation of the "gist of the action" doctrine. We disagree.

The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc. v. Ellias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002). "As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." Id.

In general, the difference between contact claims and tort claims depends upon the origin of the duties alleged to have been breach by the defendant's conduct. "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." Id. (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. 1992)).

To be sure, the two causes of action are not mutually distinct. Id. To the contrary, it is quite "possible that breach of contract also gives rise to an actionable tort." Id. But "to be construed as in tort, however, the wrong ascribed to [the] defendant must be the gist of the action, the contract being collateral." Id. (quoting Bash, 106 A.2d at 829). "In other words, a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'" Id.

12

(quoting Bohler-Uddeholm Am., Inc., v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001), cert. denied, 534 U.S. 1162 (2002)).

Whether the gist of the action doctrine applies in any particular setting is a question of law. Id. In making that determination the court is to consider both the nature of the action as a whole and the essential ground, foundation or material parts giving legal effect to the plaintiff's complaint. As a number of courts have observed:

> The test is not limited to discrete instances of conduct; rather, the test is, by its own terms, concerned with the nature of the action as a whole. "Gist" is a term of art in common law pleading that refers to the "essential ground or object of the action in point of law, without which there would be no cause of action." Blacks Law Dictionary 689 (6th ed. 1990). "Action" is defined by Black's Law Dictionary as "a lawsuit brought in a court; a formal complaint within the jurisdiction of a court of law ... the "gist of the action" tests, then, is a general test concerned with the "essential ground," foundation or material part of an entire "formal complaint" or lawsuit.

eToll, 811 A.2d at 15 (quoting American Guar. and Lia. Ins. Co., v. Fojanini, 90 F. Supp.2d 615, 622-23 (E.D. Pa. 2000)).

In general, the courts have applied the gist of the action doctrine to bar tort claims in four separate settings: (1) were the claims arise from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where a tort claim essentially duplicates a breach of contract claim or its success is wholly dependent on the terms of a contract. eToll, 811 A.2d at 20. And until the Supreme Court of Pennsylvania holds otherwise, the Superior Court has determined that "the gist of the action doctrine should apply to claims for fraud in the performance of a contract." Id.

It is clear that the gist of the action doctrine bars plaintiff's claims for fraud and misrepresentation. Plaintiff essentially complains that defendants could not live up to standards set forth in the contract. Plaintiff does not allege that the centerfuge technology employed by the defendants was a sham or simply failed to process and de-liquify plaintiff's industrial sludge. To the contrary, plaintiff consistently complained that the technology employed by defendants

13

couldn't meet the rate of production imposed by the specifications in the contract. In addition, plaintiff complains that it incurred additional costs and expenses as a result of defendant's repeated efforts to carry out the contractual covenants contained in the parties' agreement. In other words, the parties' obligations were defined by the terms of the contact and not by the larger social policies embodied in the law of torts. Such circumstances warrant the application of the gist of the action doctrine. Compare, Bishop v. GNC Franchising, LLC, 403 F. Supp.2d 411, 417 (W.D. Pa. 2005) (quoting Bohler-Uddeholm America, 247 F.3d at 104).

Plaintiff's effort to convert the gravamen of the complaint into a tort action by referencing defendants' statements of "puffery" concerning their general abilities and approaches in customer service is unavailing. At its base, plaintiff simply complains that defendant BDI did not live up to its contractual agreement. Making boiler plate allegations that a defendant's failure to live up to its contractual obligations proves that the statements concerning its ability and approach were false, fraudulent or misleading reflects nothing more than the epitome of a self-serving attempt to bootstrap a contract claim into one for fraud. Of course, "adding the words 'falsely' and 'negligently' to the representations made in the course of *reaching* an agreement does not convert what is essentially a breach of contract action into a fraud and negligence claim." Bishop, 403 F. Supp.2d at 417 (citing Galbieri v. Monsanto Co., 245 F. Supp.2d 636, 650 (E.D. Pa. 2002) ("[A] breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced.'")). And plaintiff's colorful arguments to the effect that defendants made plaintiff a financial hostage and then took advantage of the situation do not change the origin of the duties allegedly breached by defendants or the manner by which plaintiff became subjected to the harm about which it complains. Compare Caudill Seed and Warehouse Co., Inc. V. Prophet 21, Inc., 123 F. Supp.2d 826, 833-34 (E.D. Pa. 2000) (granting motion to dismiss fraud claims under gist of the action doctrine even though the defendant fraudulently strung the plaintiff along by repeatedly assuring that its products would work and live up to the promised benefits of the bargain); Harold v. McGann, 406 F. Supp.2d 562, 577 (E.D. Pa. 2005) (same).

The gist of the action doctrine clearly bars plaintiff's attempt to recast its contract claims as causes of action in tort. Consequently, Counts I and II of the complaint will be dismissed.

Finally, plaintiff's claim for deceptive trade practices must be dismissed. First, plaintiff has failed to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Act because it is not a purchaser within the meaning of the act. A private cause of action under the act extends only to "any person who purchases or leases goods or services primarily for personal, family or household purposes ..." 73 P.S. § 201-9.2(a). Because plaintiff is not a proper purchaser within the meaning of the provision of the Act providing a private cause of action, it may not rely on the Act's broader application for the purposes of private redress. See Wise v. American General Life Ins., 459 F.3d 443, 452 (3d Cir. 2006) (only purchasers within the meaning of the Act may bring a private cause of action thereunder) (collecting cases in support)).

Plaintiff's attempt to rely on Ohio's deceptive trade practices act as an alternative suffers from similar shortcomings. First, plaintiff has failed to establish competently or through any meaningful legal analysis how and why Pennsylvania's jurisprudence on conflicts of law would result in the application of Ohio law to the matter at hand. Having failed to establish that application of Pennsylvania's law would result in the application of Ohio law, this court has no obligation to displace the presumptive substantive law of the forum. But even assuming for the purposes of argument that Ohio law applies, plaintiff nevertheless has failed to state a viable claim for false advertising under the Ohio Deceptive Trade Practices Act. "The Ohio Deceptive Trade Practices Act is substantially similar to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ... in fact, an analysis appropriate for a determination of liability under Section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." HER, Inc., v. Re/Max First Choice, LLC, 468 F. Supp.2d 964, 979 (S.D. Ohio 2007) (quoting Worthington Foods, Inc., v. Kellog Co., 732 F. Supp. 1417, 1431 (S.D. Ohio 1990)). Having failed to establish standing to present a section 43(a) claim under the Lanham Act, it is clear that plaintiff lacks standing to pursue a claim under the substantially similar

15

operation of the Ohio Deceptive Trade Practices Act. Consequently, plaintiff's attempt to throw in the kitchen sink must be rejected.

For the reasons set forth above, defendants' motions to dismiss will be granted to Counts One, Two, Three, Four, Eight and Nine.[2] An appropriate order will follow.

Date: *September 28, 2007*

*D. Cercone*
David Stewart Cercone
United States District Judge

cc:  Vincent J. Restauri, Jr., Esquire
Vincent Restauri Law Offices
85 Firehorn Road
Baden, PA 15005

Paula J. Allan, Esquire
Eckert Seamans Cherin & Mellott
U.S. Steel Tower, 44th Floor
600 Grant Building
Pittsburgh, PA 15219

Robert F. Ware, Esquire
Matthew E. Liebson, Esquire
Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114

James W. Kraus, Esquire
Pietragallo, Bosick & Gordon, LLP
One Oxford Centre, 38th Floor
301 Grant Street
Pittsburgh, PA 15219

---

[2] It is well settled that a cause of action for civil conspiracy cannot stand where all causes of action in tort have been dismissed. See Thompson Cole Co., v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)("to prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. ... Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy.") (citations omitted). Merely advancing bald accusations of a conspiracy does not establish such a claim. Id. at 473.